UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN THE MATTER OF )
THE EXTRADITION OF ) Misc. No. 3:26-mj-1373-LLL
RAMIRO ANDRES LUQUE FLORES )

**MEMORANDUM OF EXTRADITION LAW AND REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS**

The United States, in fulfilling its treaty obligations to Ecuador,[1] respectfully requests that the fugitive in this case, Ramiro Andres Luque Flores ("Luque Flores"), be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why Luque Flores should be detained. In short, Luque Flores should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he poses no risk of flight and that special circumstances exist warranting his release.

**BACKGROUND**

Ecuador seeks the extradition of Luque Flores so that he may serve a sentence based on his conviction for bribery. Ecuador's Court of Criminal Guarantees sentenced Luque Flores to a five-year prison sentence for bribery on April 3, 2017.

[1] Extradition Treaty Between the United States of America and the Republic of Ecuador, U.S. Ecuador, June 28, 1872, 18 Stat. 756, as amended by the Supplementary Extradition Treaty Between the United States of America and Ecuador, U.S.-Ecuador, Sept. 22, 1939, 55 Stat. 1196 (collectively, the "Treaty")

The sentence was upheld by Ecuador's National Court of Justice. The Government of Ecuador is seeking Luque Flores's extradition based on the following facts:

The Public Hydrocarbons Company of Ecuador, also known as EP Petroecuador ("Petroecuador"), is the state-owned national oil company of Ecuador. Petroecuador, which was founded in 1989, operates several oil fields and three petroleum refineries in Ecuador.

From in or around 2011 until 2016, top Petroecuador executives solicited and received bribes from private business owners in exchange for Petroecuador awarding and honoring contracts with their businesses. The Petroecuador officials and their accomplices received the bribe payments through shell companies and bank accounts in various countries, including but not limited to Panama, the Cayman Islands, Switzerland, Canada, and the United States, and in turn moved the bribe proceeds between and among those accounts.

In or around October 2011, a top Petroecuador executive (the "executive") created a Panamanian shell company called Girbra S.A. ("Girbra"). The executive opened a bank account in Girbra's name at Helm Bank in Panama.

As described below, Luques Flores was one such private business owner who paid bribes to Petroecuador in exchange for contracts.

Luque Flores founded GalileoEnergy S.A. ("Galileo") in or around May 2012 in Ecuador. Luque Flores controlled Galileo from its inception until at least 2017. Beginning in or around late 2013, Luque Flores owned 50 percent of Galileo, and his wife owned the other 50 percent. Galileo was an Ecuadorian oil services company

that specialized in the disposal of hazardous waste from oil and gas production.

In or around October 2012, with the assistance of a financial adviser (the "financial adviser"), Luque Flores obtained a Panamanian shell company called Denfield Investments ("Denfield") and opened a U.S.-based financial account in the name of Denfield.

Sentinel Mandate and Escrow Ltd. ("Sentinel") was an escrow agent formed and registered in the British Virgin Islands. The financial adviser controlled a Sentinel bank account in the Cayman Islands (the "Sentinel account").

According to documentary evidence presented during Luque Flores' trial and other information provided by Ecuador, between in or around December 2012 and late 2016, Galileo obtained approximately six contracts with Petroecuador, worth a total of approximately $38,564,932.72. Petroecuador and Galileo entered into the first such contract, for approximately $8 million, in December 2012.

Luque Flores and the financial adviser arranged to have the payments due to Galileo from Petroecuador paid to the Sentinel account in the Cayman Islands, and the investment adviser would then forward those payments to Denfield's U.S. account. Luque Flores, without specifying the entities' names, later acknowledged this conduct during his change of plea hearing in the United States.

In or around January 2013, the same month that Petroecuador made its first payment to Galileo under the December 2012 contract, Petroecuador officials, including the executive, began soliciting bribes from Luque Flores, in exchange for Petroecuador honoring the terms of the contract with Galileo and awarding additional

contracts to Galileo. Luque Flores also acknowledged this during his change of plea hearing in the United States.

As documented during Luque Flores' trial and throughout the information provided by Ecuador, on or about January 17, 2013, Luque Flores and his wife made their first bribe payment to the executive and Petroecuador by effectuating a transfer of $50,000 from the Sentinel account to Girbra's account at Helm Bank. On or about February 27, 2013, Luque Flores and his wife made a bribe payment to the executive and Petroecuador in the same manner, in the amount of $450,000. Luque Flores and his wife made similar bribe payments to the executive and Petroecuador in March 2013 and July 2013, for a total of approximately $796,000 in bribe payments made from the Sentinel account to Girbra's account at Helm Bank.

Luques Flores subsequently admitted to the conduct upon which his bribery conviction in Ecuador is based. Notably, Luques Flores pled guilty in the U.S. District Court for the Eastern District of New York (EDNY) to conspiracy to violate the Foreign Corrupt Practices Act and to commit money laundering, pursuant to 18 U.S.C. § 371.

During Luque Flores' plea hearing in EDNY on October 6, 2017, he admitted to having paid bribes to Petroecuador officials in exchange for receiving payments he was owed on contracts with Petroecuador, and for being awarded new contracts with Petroecuador. Luque Flores stated that after he began bribing Petroecuador officials, shortly after he entered into his first contract with Petroecuador in December 2012, he

continued to receive payments under that contract and also obtained supplemental contracts and payments from Petroecuador pursuant to those contracts.

On August 17, 2016, the Prosecutor General's Office of Ecuador formulated charges against a defendant for bribery, in violation of Article 280 of Ecuador's Comprehensive Organic Criminal Code of 2014, for allegedly bribing the executive in exchange for the defendant's companies being awarded contracts with Petroecuador. On October 21, 2016, the Prosecutor General's Office added Luque Flores, his wife, the executive, and 14 other co-defendants to the charging instrument.

In January 2017, the judge issued a call to trial, which finalized the charge against Luque Flores and his 17 co-defendants and ordered that they be brought to trial. Luque Flores was not present for the trial that resulted in his bribery conviction or for the subsequent appeals, but he was represented by private attorneys of his choosing during these proceedings, in accordance with Ecuadorian law and procedure.

On April 3, 2017, the Court of Criminal Guarantees for the Canton of Quito in the Province of Pichincha found Luque Flores and 15 of his co-defendants guilty of bribery and sentenced Luque Flores to five years' imprisonment. The final sentence imposed on Luque Flores will never be time-barred, pursuant to Article 233 of the Constitution of the Republic of Ecuador of 2008. To date, Luque Flores has not served any of his sentence.

A witness who worked at Petroecuador and who personally knew Luque Flores identified a photograph of Luque Flores as the person she met in 2014 in connection with Petroecuador business. Additionally, during his plea hearing, Luque Flores

acknowledged his full name and admitted to the criminal conduct with which he was charged in the United States, as well as the criminal conduct for which he was convicted in Ecuador.

In response to a request from Ecuador, the United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181, *et seq.*, filed a complaint in this District seeking a warrant for Luque Flores's arrest pending extradition. This Court issued an arrest warrant, and Luque Flores was arrested on this extradition matter on August 26, 2026. Luque Flores is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

## I. LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

International extradition is an executive function in which the judicial branches have a limited role to play. The judicial role in extradition is closely circumscribed by treaty, statute, and case law. Although extradition shares some characteristics of a criminal proceeding, the extradition process is *sui generis*. For that reason, the United States' extradition scheme and the court's limited role in the extradition process are outlined below.

### A. The limited role of the Court in extradition proceedings

Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting

country is "sufficient to sustain the charge." 18 U.S.C. § 3184; *see Kastnerova v. United States*, 365 F.3d 980, 984 n.5 & 986 (11th Cir. 2004). The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186; *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828-29 (11th Cir. 1993). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *See Martin*, 993 F.2d at 828-29. If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and it must commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see Martin*, 993 F.2d at 828.

**B. The requirements for certification**

The Court must certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *Matter of Extradition of Wallace*, 543 F. Supp. 3d 1296, 1301 (M.D. Fla. 2021) (citing *In re Extradition of Jose Batista Do Nascimento*, No. 620CV2041ORL40GJK, 2021 WL 1192144, at *2 (M.D. Fla. Jan. 25, 2021); *In re Extradition of Shaw*, No. 14-cv-81475, 2015 WL 3442022, at *5 (S.D. Fla. May 28, 2015) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)). The following sections briefly discuss each of those requirements.

1. <u>Authority over the proceedings</u>

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," but rather acts in a "non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598,

601-02 (2d Cir. 1993). Further, the local rules authorize magistrate judges to handle extradition matters. *Wallace*, 543 F. Supp. 3d at 1301 (citing L.R. 1.02(a)).

2. Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as Luque Flores, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

3. Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also Arias v. Warden*, 928 F.3d 1281, 1285 (11th Cir. July 8, 2019); *Kastnerova*, 365 F.3d at 987. The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State attesting that there is a treaty in full force and effect between the United States and Ecuador. The Court must defer to the Department of State's determination in that regard. *E.g.*, *Arias*, 928 F.3d at 1288 (where "[Department of State] declaration set forth the United States Executive Branch's position—that the Treaty remains in full force," courts "have no answer but this: the Treaty remains in effect").

4. Crimes covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article 1st of the Treaty

provides for the return of fugitives charged or convicted of an offense specified in Article 2nd of the Treaty. Article 2nd of the Treaty lists extraditable offenses, including bribery in Item 17.

In assessing whether the Treaty covers the crime for which extradition is requested, the Court should examine Ecuador's description of the criminal conduct underlying its charge and conviction and decide whether that conduct constitutes an offense among those Article 2nd lists. *Factor v. Laubenheimer*, 290 U.S. 276, 299-300 (1933). An offense is "extraditable," regardless of whether it is expressly designated on the Treaty's list, so long as the underlying conduct constitutes one of the enumerated offenses. *See, e.g.*, *id.*; *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (treaty that listed "murder" as extraditable encompassed offenses charged as "war crimes"). In determining whether the conduct constitutes an enumerated offense, "a narrow and restricted construction is to be avoided . . . [and] if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor*, 290 U.S. at 293-94. Because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

5. Probable cause that the fugitive has committed the offenses

To certify the evidence to the Secretary of State, the Court must conclude that probable cause exists to believe that the person before the Court committed the crime underlying the extradition request. *See Wallace*, 543 F. Supp. 3d at 1302; *see also* Treaty Art. 1st (providing that surrender "is only to be done when the criminality shall be proved in such manner that, according to the laws of the country where the fugitive or accused may be found, such persons might be lawfully arrested and tried, had the crime been committed within its jurisdiction"). The evidence is sufficient, and probable cause exists, if the evidence would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Wallace*, 543 F. Supp. 3d at 1302 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based." *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (citation omitted).

**C. An extradition hearing follows unique procedures**

1. An extradition hearing is not a criminal proceeding

The purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the treaty rather than to determine the guilt or innocence of the fugitive, the latter being reserved for the foreign court. *Collins*, 259

U.S. 309, 316 (1922); *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *Kastnerova*, 365 F.3d at 987 (internal quotations and citations omitted). At its core, an extradition hearing is "an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite this person at the request of a foreign government," *see In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1284 (S.D. Fla. 2017); and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

The limited nature of the hearing has resulted in special procedural and evidentiary rules. Specifically, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply.[2] *See, e.g.*, *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1164-65 (11th Cir. 2005). The fugitive does not have a right to discovery. *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976). The fugitive's right to present evidence is severely constrained. *See Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir. 1973). The fugitive's constitutional rights are also limited. For example, the fugitive has no right to cross-examine witnesses who might testify at the hearing, *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1282-83 (S.D. Fla. 2011) (collecting cases); there is no Sixth Amendment right to a speedy trial, *Martin* 993 F.2d at 829; the Fifth Amendment

[2] Fed. R. Crim. P. 1(a)(5)(A) states that "[p]roceedings not governed by these rules include . . . the extradition and rendition of a fugitive." Fed. R. Evid. 1101(d)(3) provides that "[t]hese rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."

guarantee against double jeopardy does not apply to successive extradition proceedings, *In re Extradition of Batchedler*, 494 F. Supp. 2d 1302, 1309 (N.D. Fla. 2007) (citing *Collins*, 262 U.S. 426, 429 (1923)); the exclusionary rule is not applicable, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and the fugitive does not have the right to confront his accusers, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

2. Extradition hearings rely on written submissions and do not require live witnesses

A certification of extradition may be, and typically is, based entirely on the authenticated documentary evidence and information provided by the requesting government. *Shaw*, 2015 WL 3442022, at *4; *see also, Afanasjev*, 418 F.3d at 1165; *Nunez-Garrido*, 829 F. Supp. 2d at 1287 ("It is exceedingly rare for the Government to submit anything other than documents in support of an extradition request.").

Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. *Shapiro*, 478 F.2d at 902. Requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Id.* (citing *Bingham*, 241 U.S. at 517). Further, hearsay evidence is admissible at an extradition hearing and may fully support the court's findings leading to a certification under Section 3184. *Afanasjev*, 418 F.3d at 1165 (citing *Escobedo v. United States*, 623 F.2d 1098, 1102 n.10 (5th Cir. 1980); *Collins*, 259 U.S. at 317).

3. <u>The fugitive's right to present evidence is very limited and excludes technical and affirmative defenses</u>

Due to the nature and limited purpose of an extradition hearing under Section 3184 and the importance of the international obligations of the United States under an extradition treaty, a fugitive's opportunity to challenge the evidence introduced against him is very circumscribed. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather, may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913). A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)); *Shaw*, 2015 WL 3442022, at *8. Moreover, the admission of even explanatory evidence is largely within the discretion of the court. *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1366 (S.D. Fla. 1999).

Courts routinely reject technical and affirmative defenses in extradition proceedings. *See, Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *see also Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978); *Matter of Extradition of Martinelli Berrocal*, No. 17-22197-Civ, 2017 WL 3776953, at *27 (S.D. Fla. Aug. 31, 2017) (citing cases); *Fernandez-Morris*, 99 F. Supp. 2d at 1373 n.5. Defenses that require factual or credibility determinations are reserved for the courts in the requesting country to resolve at trial in the foreign country.

### D. Rule of non-inquiry: All matters other than certification are reserved for the Secretary of State

All matters a fugitive may raise as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184 & 3186. For example, the Secretary of State should address a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Arias*, 928 F.3d at 1295 (fairness of foreign court); *Martin*, 993 F.2d at 830 n.10 (humanitarian considerations); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state); *Quinn*, 783 F.2d at 789-90 (political crime). This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

## I. LUQUE FLORES SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[3] *See United States v. Nascimento*, No. 6:19-mc-48-ORL-78GJK, 2019 WL 5853874, at *1 (M.D. Fla. Nov.

[3] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, Luque Flores is not charged with an "offense" within the meaning of 18 U.S.C. § 3156 but rather was convicted of an offense in violation of Ecuadorian law.

8, 2019). Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

**A. Applicable law**

1. <u>A strong presumption against bail governs in an international extradition proceeding</u>

Unlike in domestic criminal cases, "there is a presumption against bond." *Martin*, 993 F.2d at 827; *see also Martinelli Berrocal*, 263 F. Supp. 3d at 1294 ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process."). The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, a requesting country meets

the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62; *Matter of Extradition of Correa*, No. 17-14059-MC-LYNCH, 2017 WL 8780154, at *2 (S.D. Fla. May 8, 2017). It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See Martinelli Berrocal*, 263 F. Supp. 3d at 1306 ("[O]ur Executive Branch has a vested interest in enforcing our own treaty obligations for fear that other treaty partners will refrain from doing so in the future. And a difficult but necessary measure in carrying out that responsibility is to secure a wanted individual and surrender him or her to the foreign jurisdiction.").

2. <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *See, e.g.*, *In re Extradition of Kirby*, 106 F.3d 855, 862-63 (9th Cir. 1996); *Leitner*, 784 F.2d at 160-61; *Shaw*, 2015 WL 521183, at *5; *Martinelli Berrocal*, 263 F. Supp. 3d at 1292 (for over a hundred years, the "special circumstances" test has been applied by

circuit and district courts for bail determinations in extradition cases).[4] "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, age, and incentive to flee based on the severity of the offense. *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1304-06; *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *In re Extradition of Patel*, 08-MJ-430-HUBEL, 2008 WL 941628, at *2 (D. Or. Apr. 4, 2008) (considering the fact that a fugitive, a physician, had "more than sufficient assets available with which to flee").

Crucially, the special circumstances inquiry is separate from, and additional to, considerations of danger to the community or risk of flight. *See, e.g.*, *Shaw*, 2015 WL 521183, at *6; *In re Extradition of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *2

[4] "The case law . . . reflects an inconsistency among courts in their analysis of flight risk in relation to the 'special circumstances' inquiry. Most courts treat flight risk as a separate, independent factor from the special circumstances analysis. The courts that examine risk of flight and special circumstances separately thus require the potential extraditee to establish the following two factors before [they] can grant bail in a foreign extradition case: (1) 'special circumstances' exist in their particular case; and (2) they are not a flight risk or a danger to the community. The majority of cases that have examined this question, especially those in our Circuit, have concluded that the risk of flight analysis is a separate inquiry." *Martinelli Berrocal*, 263 F. Supp. 3d at 1303 (citations and quotation marks omitted).

(C.D. Cal. Mar. 7, 2016) (special circumstances must exist in addition to absence of risk of flight). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 130 (E.D.N.Y. 2001) ("Absence of risk of flight is not a legally cognizable 'special circumstance' justifying release from bail.") (citing cases). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995).

"Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition." *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996) (citing *In re Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996);
- The fugitive's need to consult with an attorney or participate in pending litigation, *see, e.g.*, *Smyth*, 976 F.2d at 1535-36;
- The fugitive's character, background, or ties to the community, *see, e.g.*, *In re Extradition of Noeller*, No. 17-CR-664, 2017 WL 6462358, at *5 (N.D. Ill. Dec. 19, 2017); *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);
- That the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Noeller*, 2017 WL 6462358, at *8-9; *Martinelli Berrocal*, 263 F. Supp. 3d at 1301-02; *In re Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *Matter of Extradition of Carr*, 20-CR-370, 2020 WL 4816052, at *6 (N.D. Ill. Aug. 18, 2020); *Matter of Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1072 (C.D. Cal. 2017); *Matter of Knotek*, 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *Shaw*, 2015 WL 521183, at *8; *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive during extradition proceedings, *see, e.g.*, *Salerno v. United States*, 878 F.2d 317, 318 (9th Cir. 1989); *Martinelli Berrocal*, 263 F. Supp. 3d at 1297-98; *Antonowicz*, 244 F. Supp. 3d at 1070; and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1298-99; *Antonowicz*, 244 F. Supp. 3d at 1070; *Kyung Joon Kim*, 2004 WL 5782517, at *2; *Siegmund*, 887 F. Supp. at 1386-87.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

### B. Analysis

The Court should detain Luque Flores without bond because he is a flight risk, and because the United States is unaware of any special circumstances that would warrant bail.

Luque Flores has a history of evading justice. A fugitive charged with or convicted of crimes in another country is, by definition, in flight or deliberately absent from that jurisdiction, and the fact that the fugitive has evaded prosecution and imposition of a sentence in that country is indicative of his risk of flight in the United States. *Cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same-the avoidance of prosecution.") (citing *Jhirad*, 536 F.2d at 483). Luque Flores entered the United States just a few days before a co-defendant was formally charged and two months before Luque Flores himself was formally charged. A judge in Ecuador initially declined to issue an arrest warrant for Luque Flores, and instead, ordered that he present himself before the court three times a week while remaining out of custody. When Luque Flores failed to appear before the court, in November 2016, the judge ordered his detention. Luque Flores did not return to Ecuador for his trial or appellate proceedings, nor has he returned to serve the sentence that was imposed on him and upheld on appeal.

Further, now that Luque Flores is aware that Ecuador seeks his extradition from the United States and that the United States intends to honor its treaty obligation to Ecuador, he has strong incentive to flee further, whether to a third country or to an underground location within the United States. The government's relatively low burden of proof in extradition proceedings, and the prospect of serving his sentence in Ecuador, render him an unmitigable flight risk. *See, e.g.*, *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 483 (S.D. Tex. 2010) (finding that fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there are significant risks that he will be formally extradited"); *In re Extradition of Adame*, 2013 WL 1222115, at *3 (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there is a significant risk that he will be formally extradited to Mexico"). The flight risk Luque Flores poses is fatal to any bail application he may submit.

Accordingly, the Court should find that Luque Flores is not eligible for bail in this extradition proceeding. Moreover, Luque Flores' risk of flight is sufficient for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that Luque Flores is not a flight risk or danger to the community, the government is unaware of any "special circumstances" that would justify bail in this case. *Cf. In re Drumm*, 150 F. Supp. 3d 92, 97-100 (D. Mass. 2015) (denying bail because of a failure to show a special circumstance, even though the court found that

defendant posed no danger to the community and defendant's risk of flight could be adequately mitigated).

Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to the Government of Ecuador, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

## CONCLUSION

For the foregoing reasons, the United States requests that Luque Flores be detained pending resolution of this extradition proceeding.

Dated: August 26, 2026

Respectfully submitted,

GREGORY W. KEHOE
United States Attorney

By: */s/ Elisibeth Adams*
ELISIBETH ADAMS
Assistant United States Attorney
Florida Bar No.: 1015275
300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202
Telephone: (904) 301-6300
Facsimile: (904) 301-6310
E-mail: elisibeth.adams@usdoj.gov